UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**Mark Crawford, et al.,**

*Plaintiffs,*

**v.**                                                    **Case No. 3:15-cv-250**
                                                          **Judge Thomas M. Rose**

**United States Department of the Treasury, et al.,**

*Defendants.*

---

## ENTRY AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, ECF. 8.

---

Plaintiffs request that the Court enjoin Defendants from enforcing the Foreign Account Tax Compliance Act("FATCA"), the intergovernmental agreements ("IGAs") negotiated by the United States Department of the Treasury ("Treasury Department") to supplant FATCA in the signatory countries, and the Report of Foreign Bank and Financial Accounts ("FBAR") administered by the United States Financial Crimes Enforcement Network ("FinCEN").  FATCA mandates that foreign financial institutions report the tax return information of their U.S. citizen account holders directly to the IRS using the FATCA Report (Form 8966). 26 U.S.C.§ 1471(b)(1)(C); 26 C.F.R. §§ 1.1471-4(d)(3)(v), -4(d)(3)(vi).

Plaintiffs seek preliminary injunctive relief on all claims. The first claim challenges the validity of the Canadian, Czech, Israeli, and Swiss IGAs used by the Treasury Department.   The second claim addresses the information reporting provisions FATCA and the IGAs impose not on

1

Plaintiffs, but on foreign financial institutions. The third claim aims at the heightened reporting requirements for foreign bank accounts under FATCA, the IGAs, and the FBAR. These reporting requirements require U.S. citizens to report information about their foreign bank accounts. The fourth claim challenges the 30% tax imposed by FATCA on payments to foreign financial institutions from U.S. sources when these foreign institutions choose not to report to the IRS about the bank accounts of their U.S. customers (the "FFI Penalty"). Similarly, the fifth claim challenges the 30% tax imposed by FATCA on account holders who exercise their rights under the statute not to identify themselves as American citizens to their banks and to refuse to waive privacy protections afforded their accounts by foreign law (the "Passthrough Penalty"). The sixth claim challenges the penalty imposed under the Bank Secrecy Act for "willful" failures to file an FBAR for foreign accounts, which can be as much as the greater of $100,000 or 50% of the value of the unreported account (the "Willfulness Penalty").

## I.    Background

## A.    FATCA Statute and Regulations

Congress passed the Foreign Accounts Tax Compliance Act (FATCA) in 2010 to improve compliance with tax laws by U.S. taxpayers holding foreign accounts. FATCA accomplishes this through two forms of reporting: (1) by foreign financial institutions (FFIs) about financial accounts held by U.S. taxpayers or foreign entities in which U.S. taxpayers hold a substantial ownership interest, 26 U.S.C. § 1471; and, (2) by U.S. taxpayers about their interests in certain foreign financial accounts and offshore assets. 26 U.S.C. § 6038D.

### 1. FATCA

President Obama signed FATCA into law on March 18, 2010. Senator Carl Levin, a co-sponsor of the FATCA legislation, declared that "offshore tax abuses [targeted by FATCA] cost the federal treasury an estimated $100 billion in lost tax revenues annually" 156 Cong. Rec. 5 S1745-01 (2010). FATCA became law as the IRS began its Offshore Voluntary Disclosure Program (OVDP), which since 2009 has allowed U.S. taxpayers with undisclosed overseas assets to disclose them and pay reduced penalties. By 2014, the OVDP collected $6.5 billion through voluntary disclosures from 45,000 participants. "IRS Makes Changes to Offshore Programs; Revisions Ease Burden and Help More Taxpayers Come into Compliance," http://www.irs.gov/uac/Newsroom/IRS-Makes-Changes-to-Offshore-Programs;-Revisions-Ease-Burden-and-Help-More-Taxpayers-Come-into-Compliance (last visited Sept. 15, 2015). The success of the voluntary program has likely been enhanced by the existence of FATCA.

### 2. Foreign Financial Institution Reporting Under FATCA

Foreign Financial Institution reporting encourages FFIs to disclose information on U.S. taxpayer accounts. If the FFI does not, then a 30% withholding tax may apply to U.S.-sourced payments to the non-reporting FFI. A 30% withholding tax may also apply to FFI account holders who refuse to identify themselves as U.S. taxpayers.

> In the case of any withholdable payment to a foreign financial institution which does not meet the requirements of subsection (b) [specifying reporting criteria], the withholding agent with respect to such payment shall deduct and withhold from such payment a tax equal to 30 percent of the amount of such payment.

26 U.S.C. § 1471(a).

Section 1471(b)(1) then provides that, "[t]he requirements of this subsection are met with respect to any foreign financial institution if an agreement is in effect between such institution and

the Secretary [of the Treasury] under which such institution agrees" to make certain information disclosures and "to deduct and withhold a tax equal to 30 percent of . . . [a]ny [pass-through] payment which is made by such institution to a recalcitrant account holder or another foreign financial institution which does not meet the requirements of this subsection[.]" § 1471(b)(1)(D)(i); see also § 1471(d)(7) (defining "pass[-through] payment"). A "recalcitrant account holder" is one who "[f]ails to comply with reasonable requests for information" that is either information an FFI needs to determine if the account is a U.S. account (§ 1471(b)(1)(A)) or basic information like the account holder's name, address, and taxpayer identification number (§ 1471(c)(1)(A)). Section 1471(c)(1) specifies the "information required to be reported on U.S. accounts," including "account balance or value." § 1471(c)(1)(C). Plaintiffs seek a preliminary injunction against enforcement of § 1471(a), (b)(1)(D), (c)(1), and (c)(1)(C). Prayer for Relief (part O).

Under § 1471(b)(2), "Financial Institutions Deemed to Meet Requirements in Certain Cases," an FFI "may be treated by the Secretary as meeting the requirements of this subsection if … such institution is a member of a class of institutions with respect to which the Secretary has determined that the application of this section is not necessary to carry out the purposes of this section." That means that an FFI that is treated this way is not subject to the reporting criteria in § 1471(b)(1). The Secretary can statutorily exempt FFIs from "attempt[ing] to obtain a valid and effective waiver" of foreign nondisclosure laws from each account holder and can exempt FFIs from "close such account . . . if a waiver . . . is not obtained from each such holder within a reasonable period of time." § 1471(b)(1)(F).1 The Secretary's exemption of an FFI under §

---

1  If the country enters into an intergovernmental agreement (IGA) this provision becomes irrelevant because consent is no longer a legal impediment under foreign law.

4

1471(b)(2) also means that the FFI no longer has to make the report described in § 1471(c)(1) because that report is based on "[t]he agreement described in subsection (b)" that an FFI that the Secretary has exempted does not need to have in place to avoid withholding. Furthermore, the FATCA statute provides that, "[t]he Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the purposes of, and prevent the avoidance of, this chapter," i.e., §§ 1471-74. 26 U.S.C. § 1474(f). The Government asserts that the intergovernmental agreements (IGAs) constitute the Secretary's exercise of the statutory discretion afforded by §§ 1471(b)(2) and 1474(f).

Plaintiffs also seek to enjoin enforcement of 26 C.F.R. § 1.1471-2T(a)(1). The "[g]eneral rule of withholding" under § 1471(a) is largely reiterated by 26 C.F.R. § 1.1471-2T(a)(1), which Plaintiffs also target. Prayer for Relief (part R). Plaintiffs seek to enjoin enforcement of 26 C.F.R. §§ 1.1471-4(a)(1), 1.1471-4(d), and 1.1471- 4(d)(3)(ii), which repeat the content of § 1471(b) and (c). Prayer for Relief (part S). In addition, Plaintiffs seek an injunction against 26 C.F.R. § 1.1471-4T(b)(1), which addresses the 30% withholding tax for recalcitrant account holders established by the statute. Prayer for Relief (part T). Plaintiffs also seek to enjoin the IRS's use of Form 8966, "FATCA Report," the form on which FFIs make disclosures under § 1471(c). See 26 C.F.R. § 1.1471-4(d)(3)(v); Prayer for Relief (part V). In Plaintiffs' view, these FATCA regulations "primarily elaborate on the [] requirements of the statutory provisions and clarify the statutory requirements." Complaint ¶ 95(a).

### 3. Individual Reporting Under FATCA

There is a companion individual reporting requirement to § 1471's FFI reporting requirement located at 26 U.S.C. § 6038D. Under § 6038D, individuals holding more than

$50,000 of aggregate value in "specified foreign financial assets," § 6038D(b), must file a report with their annual tax returns (§ 6038D(a)) that includes, for each asset "[t]he maximum value of the asset during the taxable year." § 6038D(c)(4). Plaintiffs seek to enjoin this asset-value reporting requirement. Prayer for Relief (part P). Section 6038D(h) also provides that, "[t]he Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the purposes of this section . . . ." Plaintiffs seek to enjoin enforcement of the regulation that states this same reporting requirement. 26 C.F.R. § 1.6038D-4(a)(5); see Prayer for Relief (part U). Plaintiffs also target two other regulatory reporting requirements: disclosing whether a depository or custodial account was opened or closed during the taxable year (26 C.F.R. § 1.6038D-4(a)(6)); and "[t]he amount of any income, gain, loss, deduction, or credit recognized for the taxable year with respect to the reported specified foreign financial asset," (26 C.F.R. § 1.6038D-4(a)(8)). Prayer for Relief (part U).

## B.    The Canadian, Czech, Israeli, and Swiss Intergovernmental Agreements

Once FATCA became law, the Government began requiring coordination with FFIs and foreign governments. To facilitate FATCA implementation, the United States has concluded over 70 intergovernmental agreements (IGAs) with foreign governments addressing the exchange of tax information. Plaintiffs seek to enjoin IGAs with Canada, the Czech Republic, Israel, and Switzerland in their entirety. Prayer for Relief (parts A, E, I, M). Alternatively, they seek to enjoin parts of those IGAs. Prayer for Relief (parts B-D, FH, J-L, N).

The Canadian, Czech and Israeli IGAs are similar because they are all "Model 1" IGAs, whereas the Swiss IGA is a "Model 2" IGA. The key distinction is that under Model 1 IGAs, foreign governments agree to collect their FFIs' U.S. account information and to send it to the IRS,

whereas under Model 2 IGAs, foreign governments agree to modify their laws to the extent necessary to enable their FFIs to report their U.S. account information directly to the IRS. All four IGAs, in their preambulatory clauses, recognize the partner governments' mutual "desire to conclude an agreement to improve international tax compliance" or, in the case of Switzerland, a "desire to conclude an agreement to improve their cooperation in combating international tax evasion." IGA Preambles (first clause).

All four IGAs mention the Tax Information Exchange Agreements (TIEAs) that the United States has with these four countries as part of preexisting treaties. IGA Preambles (second clause).2 All four IGAs similarly note the need for "an intergovernmental approach to FATCA implementation" (or, in the Swiss case, "intergovernmental cooperation to facilitate FATCA implementation").

The three Model 1 IGAs (Canadian, Czech and Israeli) define "Obligations to Obtain and Exchange Information with Respect to Reportable Accounts" in Article 2. In addition to seeking to enjoin Article 2 in full (Prayer for Relief, parts B, F, and J), Plaintiffs attack the agreement that IGA partners, with respect to each "U.S. Reportable Account" of its FFIs, will report, "in the case of any Depository Account, the total gross amount of interest paid or credited to the account during the calendar year or other appropriate reporting period[.]" Canadian IGA Art. 2, § 2(a)(6); Czech IGA Art. 2, § 2(a)(6); Israeli IGA Art. 2, § 2(a)(6); see Prayer for Relief (parts C, G, K). If Model 1 partner countries comply with Article 2 as well as the "Time and Manner of Exchange of

---

2 See Convention Between the United States and Canada with Respect to Taxes on Income and on Capital done at Washington on September 26, 1980 ("Canadian Convention"), Article XXVII; Convention between the United States of America and the Czech Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, done at Prague on September 16, 1993 ("Czech Convention"), Article 29; Convention between the Government of the United States of America and the Government of the State of Israel with Respect to Taxes on Income, done at Washington on November 20, 1975 ("Israeli Convention"), Article 29; and Convention between the United States and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income, signed at Washington on October 2, 1996 ("Swiss Convention"), Article 26.

Information" agreed to in Article 3 and other rules, then their reporting FFIs "shall be treated as complying with, and not subject to withholding under, section 1471," nor will they be required to withhold "with respect to an account held by a recalcitrant account holder" under § 1471. Canadian IGA Art. 4, §§ 1, 2; Czech IGA Art. 4 §§ 1, 2; Israeli IGA Art. 4, §§ 1, 2. This is consistent with the Treasury Secretary's power to deem FFIs to be in compliance with § 1471 if statutory purposes are met. 26 U.S.C. § 1471(b)(2)(B).

The Israeli IGA is not yet in force. See Israeli IGA, Art. 10, § 1. However, the Government asserts that the Treasury Secretary has exercised his discretion not to impose § 1471 withholding against Israeli FFIs or recalcitrant account holders.

The Swiss IGA is different in that under its Article 3—which Plaintiffs seek to enjoin (Prayer for Relief, part N)—the Swiss government agrees to "direct all Reporting Swiss Financial Institutions" to report certain information directly to the IRS. Swiss IGA, Art. 3, § 1. Under Article 5—which Plaintiffs also seek to enjoin (Prayer for Relief, part N)—the U.S. government "may make group requests . . . based on the aggregate information reported to the IRS pursuant to" Article 3. Swiss IGA Art. 5, § 1. "Such requests shall be made pursuant to Article 26 of the [Swiss] Convention, as amended by the Protocol," and, "such requests shall not be made prior to the entry into force of the Protocol[.]" Swiss IGA, Art. 5, § 2. The "Protocol" being "the Protocol Amending the [Swiss] Convention that was signed at Washington on September 23, 2009." Swiss IGA, preamble (clause 3). That Protocol has not yet been approved by the Senate, and because of that, Article 5 of the Swiss IGA cannot yet be implemented.

**C.      Report of Foreign Bank and Financial Account**

The third body of law at issue in this case pertains to the Report of Foreign Bank and Financial Account (FBAR) requirements.  U.S. persons who hold a financial account in a foreign country that exceeds $10,000 in aggregate value must file an FBAR with the Treasury Department reporting the account. See 31 U.S.C. § 5314; 31 C.F.R. § 1010.350; 31 C.F.R. § 1010.306(c).  The current FBAR form is FinCEN Form 114.  The form has been due by June 30 of each year regarding accounts held during the previous calendar year. § 1010.306(c).  Beginning with the 2016 tax year , the due date of the form will be April 15. Pub. L. No. 114-41, § 2006(b)(11).  A person who fails to file a required FBAR may be assessed a civil monetary penalty. 31 U.S.C. § 5321(a)(5)(A).  The amount of the penalty is capped at $10,000 unless the failure was willful. See § 5321(a)(5)(B)(i), (C).  A willful failure to file increases the maximum penalty to $100,000 or half the value in the account at the time of the violation, whichever is greater. § 5321(a)(5)(C).  In either case, whether to impose the penalty and the amount of the penalty are committed to the Secretary's discretion. See § 5321(a)(5)(A) ("The Secretary of the Treasury may impose a civil money penalty[.]") & § 5321(a)(5)(B) ("[T]he amount of any civil penalty . . . shall not exceed" the statutory ceiling).  Plaintiffs seek to enjoin enforcement of the willful FBAR penalty under § 5321(a)(5). Prayer for Relief, part Q.  They also ask for an injunction against "the FBAR account-balance reporting requirement" of FinCen Form 114. Prayer for Relief, part W.

The Government asserts that the information in the FBAR assists law enforcement and the IRS in identifying unreported taxable income of U.S. taxpayers that is held in foreign accounts as well as investigating money laundering and terrorism.

## II.    Legal Standard for Preliminary Injunctions

The standard for determining whether to issue a preliminary injunction involves the examination of: (1) the likelihood of plaintiff's success on the merits; (2) whether or not the injunctive relief will save plaintiff from irreparable injury; (3) whether or not the injunctive relief will harm others; and (4) whether or not public interest will be served by the injunction. See *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Prods*., 134 F.3d 749, 753 (6th Cir. 1998); *In re DeLorean Motor Co*., 755 F.2d 1223, 1228 (6th Cir. 1985). These factors are not prerequisites, but elements balanced by the Court. *Frisch's Restaurants, Inc. v. Shoney's Inc*., 759 F.2d 1261, 1263 (6th Cir. 1985) and *DeLorean Motor Co*., 755 F.2d at 1229.   The Court will evaluate each of these factors.

## A.     Likelihood of Prevailing on the Merits

Defendants initially contend that Plaintiffs are not likely to prevail on the merits of their claim because they lack standing to bring their action.   Federal courts may only decide actual cases or controversies. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997).   The standing requirement protects the "time-honored concern about keeping the Judiciary's power within its proper constitutional sphere." Id. at 820.   "[S]tanding inquir[ies are] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013).

Standing contains three elements:

> First, plaintiffs must have suffered an injury in fact—an invasion of
> a legally protected interest which is (a) concrete and particularized

> and (b) actual or imminent, not conjectural or hypothetical. Second,
> there must be a causal connection between the injury and the
> conduct complained of—the injury has to be fairly traceable to the
> challenged action of the defendant, and not the result of the
> independent action of some third party not before the court. Third, it
> must be likely, as opposed to merely speculative, that the injury will
> be redressed by favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotation

omitted).

As for the first consideration, a "threatened injury must be certainly impending to

constitute injury in fact," and "'[a]llegations of possible future injury' are not sufficient." *Clapper*,

133 S. Ct at 1147 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in

original).   Similarly, "a plaintiff raising only a generally available grievance about

government—claiming only harm to his and every citizen's interest in proper application of the

Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it

does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at

573-74; see also id. at 577 (rejecting attempt "to convert the undifferentiated public interest in

executive officers' compliance with the law into an 'individual right' vindicable in the courts").

Also, plaintiffs generally cannot establish standing indirectly when their injury is the result of "the

independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 42 (1976); see also *Lujan*, 504 U.S. at 560-61 (same); *Shearson v. Holder*, 725 F.3d

588, 592 (6th Cir. 2013) (same); *Ammex, Inc. v. United States*, 367 F.3d 530, 533 (6th Cir. 2004)

(no standing to challenge excise tax assessed against third party, since "alleged injury . . . in the

form of increased fuel costs was not occasioned by the Government").

As to the second consideration, "a plaintiff must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Coyne*, 183 F.3d at 494 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); see also *United States v. Ovalle*, 136 F.3d 1092, 1100-01 (6th Cir. 1998); *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). The rare exception to this requirement arises where a plaintiff can "show that (1) it has suffered an injury in fact; (2) it has a close relationship to the third party; and (3) there is some hindrance to the third party's ability to protect his or her own interests." *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 404 (6th Cir. 1999); see also *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 295 (6th Cir. 1998).

"A plaintiff bears the burden of demonstrating standing and must plead its components with specificity." *Coyne*, 183 F.3d at 494; see also *Lujan*, 504 U.S. at 561.   A plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 185 (2000)).   The Supreme Court has "always insisted on strict compliance with this jurisdictional standing requirement," *Raines*, 521 U.S. at 819.   Moreover, "suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations are, even when premised on allegations of several instances of violations of law, rarely if ever appropriate for federal-court adjudication." *Lujan*, 504 U.S. at 568 (quotation omitted).

Senator Paul seeks to base legal standing for Counts 1 and 2 in his role as a U.S. Senator, charged with the institutional task of advice and consent under the Constitution.   He contends that the IGAs exceed the proper scope of Executive Branch power and should have been submitted for Senate approval. ¶¶ 28, 29.

Senator Paul's argument that the Executive Branch is usurping Congress's powers by not submitting the IGAs for a vote—that he has a "right to vote"—is a claim that the Executive Branch is not acting in accordance with the law and that he may remedy such violation in his official capacity as a senator. In *Raines v. Byrd*, several members of Congress challenged the constitutionality of the Line Item Veto Act of 1996, asserting that the statute infringed on their power as legislators. 521 U.S. at 816. The Supreme Court held that they lacked Article III standing. It noted that their claim asserted "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Id*. at 821. Because Plaintiffs' "claim of standing [was] based on a loss of political power, not loss of any private right," their asserted injury was not "concrete" for the purposes of Article III standing. *Id*. *Raines* bars Senator Paul's claims. This is true even if he frames the conduct he challenges as a "usurpation" of congressional authority. See *Chenoweth v. Clinton*, 181 F.3d 112, 116 (D.C. Cir. 1999) (a claim of usurpation of congressional authority is not sufficient to satisfy the standing requirement); see also *Walker v. Cheney*, 230 F. Supp. 2d 51, 73 (D.D.C. 2002) ("the role of Article III courts has not historically involved adjudication of disputes between Congress and the Executive Branch based on claimed injury to official authority or power.").

Senator Paul has not been authorized to sue on behalf of the Senate. This fact also weighs against finding standing. See *Raines*, 521 U.S. at 829 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action[.]"). Members of Congress possess an adequate remedy (since they may repeal the Act or exempt appropriations bills from funding its implementation). *Raines*, 521 U.S. at 829.

13

Nor can Senator Paul base his standing on a more generalized interest in "vindication of the rule of law." See *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998); see also *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone[.]" (quotation omitted)). A legislator does not hold any legally protected interest in proper application of the law that is distinct from the interest held by every member of the public.   Senator Paul thus fails to allege a particularized, legally cognizable injury by his claim that the Executive Branch is not adhering to the law. See *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000) (Congressional plaintiffs do not "have standing anytime a President allegedly acts in excess of statutory authority").

Senator Paul has "not been singled out for specially unfavorable treatment." *Raines*, 521 U.S. at 821.   All Plaintiffs here, including Senator Paul, have an adequate remedy to challenge the reporting requirements and penalties that they oppose: they may work toward repeal of the laws through the legislative process. *Id.*   Of course, FATCA, the IGAs, and the FBAR requirements are not exempt from constitutional challenge, but they must be challenged by an individual who has suffered a judicially cognizable injury. *Id.* Plaintiffs in this case do not qualify.

In sum, Paul has alleged no injury to himself as an individual, the institutional injury he alleges is wholly abstract and widely dispersed, and his attempt to litigate this dispute at this time and in this form is contrary to historical experience. *Raines*, 521 U.S. at 829

None of the other Plaintiffs has alleged that he or she has suffered or is about to suffer injury under the FATCA withholding tax: none is an FFI to which the tax under § 1471(a) applies, and none has been assessed, or informed that IRS intends to assess, the recalcitrant account holder

14

withholding tax imposed by § 1471(b).   Moreover, all Plaintiffs but Crawford live in jurisdictions where FFIs are not currently subject to the § 1471(b) withholding tax.   No plaintiff has alleged that he or she is subject to § 6038D reporting due to an aggregate asset value exceeding $50,000 or FBAR reporting due to a bank account exceeding $10,000 in value.

Mark Crawford decries his bank's policy against taking U.S. citizens as clients and claims the denial of his application for a brokerage account may have "impacted Mark financially," ¶ 21, any such harm is not fairly traceable to an action by Defendants, which are not responsible for decisions that foreign banks make about whom to accept as clients.   Crawford cannot establish standing indirectly when third parties are the causes of his alleged injuries. See *Shearson*, 725 F.3d at 592.   Moreover, his discomfort with complying with the disclosures required by FATCA, see ¶ 23, does not establish the concrete, particularized harm that confers standing to sue. See, e.g., *Lujan*, 504 U.S. at 561 (requiring "concrete and particularized" and "actual or imminent" injury). Even if Crawford fears "unconstitutionally excessive fines imposed by 31 U.S.C. § 5321 if he willfully fails to file an FBAR," ¶ 24, there is no allegation that he failed to file any FBAR that may have been required, much less that the Government has assessed an "excessive" FBAR penalty against him.   Any harm that may come his way from imagined future events is speculative and cannot form the foundation for his lawsuit.

Crawford states that he is a United States citizen who lives in Albania and maintains a residence in Dayton, Ohio. ¶ 13. The United States does not have a FATCA IGA with Albania, and Crawford does not allege that he has a bank account in any of the four countries whose IGAs are challenged in the complaint. That means that Crawford has no standing to assert the violations alleged in Counts 1, 2, or 8, which exclusively concern those four IGAs.

15

Crawford seeks to invalidate FATCA and the FBAR requirements on three bases: (1) his brokerage firm cannot accept U.S. citizens—including Crawford himself—as clients, due to a relationship with a bank that has a policy against taking on American clients, see ¶ 21; (2) he does not want the "financial details of his accounts" disclosed to the U.S. government, see ¶ 23; and (3) he fears "unconstitutionally excessive fines imposed by 31 U.S.C. § 5321 if he willfully fails to file an FBAR," see ¶ 24.

Roger Johnson states that he is a U.S. citizen who resides in the Czech Republic. ¶ 31. He seeks to invalidate the Czech IGA, FATCA, and the FBAR reporting requirements because: (1) his wife, who is not a plaintiff, "strongly objected to having her financial affairs disclosed to the United States government," leading to the couple's decision to separate their assets, see ¶ 35; (2) he does not want the financial details of his accounts disclosed, see ¶ 38; and (3) he fears "unconstitutionally excessive fines" if he willfully fails to file an FBAR, see ¶ 39.

The harm Johnson alleges resulted from his wife's objections to FATCA and the choices that they made in response; this is not traceable to the Government. See *Simon*, 426 U.S. at 41-42. The Johnsons are free to reverse the separation of their assets at any time, regardless of FATCA, and the lack of legal compulsion defeats any claim to third-party standing. Johnson's personal discomfort with reporting requirements of American law does not support standing, as he does not allege any concrete constitutional injury. See *Lujan*, 504 U.S. at 561. Nor is the prospect of the hypothetical imposition of an excessive fine, if he willfully fails to file a required FBAR, sufficient. *Clapper*, 133 S. Ct at 1147 ("Allegations of possible future injury" do not convey standing). In effect, Johnson seeks an advisory opinion that future, hypothetical conduct by the Government would violate his constitutional rights.

16

Stephen J. Kish states that he is a dual citizen of the United States and Canada who lives in Toronto. ¶ 41.  Kish alleges that his wife "strongly opposes the disclosure of her personal financial information" under FATCA. ¶ 47.  His wife is not a plaintiff.  Kish may not assert claims on her behalf. See *Coyne*, 183 F.3d at 494.  That he has allegedly suffered some "discord" in his marriage, see ¶ 47, is too vague and indirect of a harm to establish standing.  As explained above, reluctance to comply with the reporting requirements of American law, see ¶ 48, and theoretical "excessive fines" that would be imposed if he willfully violated the law, see ¶ 49, do not convey standing.

Daniel Kuettel states that he is a citizen of Switzerland who renounced his U.S. citizenship in 2012. ¶ 51.  He claims that he decided to renounce due to "difficulties caused by FATCA," and he complains that "many Swiss banks have been unwilling to accept American clients because of FATCA." ¶ 55.  He blames this practice of the Swiss banks for his "mostly unsuccessful" efforts to obtain mortgage refinancing prior to his renunciation of citizenship. *Id.*  The only ongoing injury that Kuettel alleges is related to a college savings account for his daughter that he maintains at a Swiss bank. See ¶ 56.  The account balance is currently only about $8,400, which is below the $10,000 threshold for FBAR reporting.  Kuettel's daughter is ten years old, see ¶ 54, and is not a plaintiff in this case. Supposedly the account would receive "several advantages such as better interest rates and discounts for local businesses" if it were titled in her name. ¶ 56.  The Complaint states Kuettel would like to transfer ownership of the account to his daughter, but he will not do so out of a concern that she might in the future be subjected to willful FBAR penalties, that she might be subject to an alleged harm. ¶ 57.13  Kuettel could obviate this concern by filing an FBAR for the account on his daughter's behalf, but "Daniel objects to filing an FBAR as required by FinCEN

17

because he is not a U.S. citizen and would not do so for his daughter's account." ¶ 57.    His wife similarly objects.    His daughter is said to be too young to renounce her own U.S. citizenship. ¶ 57. Neither his wife, nor his daughter are named as plaintiffs, however.    Thus, having renounced his own American citizenship, Kuettel now seeks relief based on his daughter's ineligibility for preferable interest rates and local discounts.    The relief for any wrong here is either for Kuettel's daughter to sue her Swiss bank for disparate treatment, if Swiss law provides such protection, or to seek recourse in the power of the market moving her accounts to an institution that wishes to compete for her business.

None of the allegations states that Kuettel is presently being harmed by FATCA or the Swiss IGA, and neither FATCA nor the IGA apply to him as a non-U.S. citizen. See ¶¶ 51-58. His assertion of past harm because he was "mostly unsuccessful" in refinancing his mortgage due to FATCA does not convey standing.    If that was a harm, it was due to actions of third-party foreign banks not those of Defendants.    Regardless, having now renounced his American citizenship and obtained refinancing on terms he found acceptable, any past harm is not redressable here. See *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995) ("[T]he fact of past injury . . . does nothing to establish a real and immediate threat that he would again suffer similar injury in the future." (quotation omitted)).    This leaves Kuettel's claims concerning the FBAR requirement, in Counts 3 and 6, for which the Government concedes Kuettel has standing. Response, ECF 16, at 15, PAGEID 216.

Kuettel also lacks standing to challenge the FBAR reporting requirements that might apply not to him, but to his daughter.    The reporting requirement would be hers, and any harm to the account is a detriment to her.    Advantages his daughter might receive if Kuettel or his wife filed

18

an FBAR on his daughter's behalf are based on a bank policy, not conduct of Defendants. The failure to reap those advantages is due to the Bank's policies regarding someone like Kuettel's reluctance to comply with the FBAR requirements, not any action fairly traceable to the Government. In any event, Kuettel has not established standing to sue on behalf of his daughter. See *Ovalle*, 136 F.3d at 1100-01.

Donna-Lane Nelson is a citizen of Switzerland who has also renounced her U.S. citizenship. ¶ 59. She alleges that her Swiss bank "notified her that she would not be able to open a new account if she ever closed her existing one because she was an American. Fearing that she would eventually not be able to bank in the country where she lived, she decided to relinquish her U.S. citizenship." ¶ 65. After she renounced, a Swiss bank "offered investment opportunities that were not available to her as an American." *Id.* She "resents having to provide" "explanations" to Swiss banks that have requested information on her past U.S. citizenship and payments to her daughter, who lives in the United States, and she sees "threats implied by these requests which appear to be prompted by FATCA." ¶ 68. Like other Plaintiffs, Nelson does not want to disclose financial information to the Government, and she fears willful FBAR penalties, even though no such penalty has been imposed or threatened against her. ¶¶ 69, 70. Unlike the preceding Plaintiffs, however, she adds that she fears the 30% withholding tax may be imposed against her "if her business partner," who is now her husband, and with whom she has joint accounts, "opts to become a recalcitrant account holder." ¶ 71.

Nelson's allegations of harm stem from third-party conduct and do not grant her standing against Defendants. Fear of hypothetical events that might have befallen her if she had not renounced her U.S. citizenship does not constitute concrete harm sufficient to confer Article III

standing. Her claim "that she had to choose between having the ability to access local financial services where she lived or be a U.S. citizen" is refuted by her admission that UBS would have allowed her to continue banking in Switzerland as before, using her existing account, regardless of her citizenship. ¶ 65. Discretionary decisions of a foreign bank do not create standing. If her business partner and husband causes Nelson to be subjected to FBAR penalties by his future conduct that will be his fault, not Defendants'. Having renounced her U.S. citizenship and without standing to assert these claims, Nelson cannot air her "resentment" of U.S. law in this Court.

L. Marc Zell states that he is a practicing attorney and a citizen of both the United States and Israel who lives in Israel. He alleges that: (1) he and his firm have been required by Israeli banking institutions to complete IRS withholding forms for individuals whose funds his firm holds in trust, regardless of whether the forms are legally required, causing certain clients to leave his firm, ¶¶ 79 & 81; (2) Israeli banks have required his firm to close accounts, refused to open others, and requested conduct contrary to banking regulations, ¶¶ 79-80; and, (3) the compelled disclosure of his fiduciary relationship with clients impinges on the attorney-client relationship, ¶ 82. On request of clients, who claim their rights are violated by FATCA, Zell "has decided not to comply with the FATCA disclosure requirements whenever that alternative exists." ¶ 83. He fears that the FATCA 30% withholding tax on pass-through payments to recalcitrant account holders could be imposed due to his refusal to provide identifying information about a client to an Israeli bank. ¶ 84. He also has refused to provide information to his own bank and "fears that he will be classified as a recalcitrant account holder," ¶ 85. Like the other Plaintiffs, he does not want his

20

financial information disclosed, ¶ 86, and fears an FBAR penalty if the IRS determines that he willfully failed to file an FBAR, ¶ 87.

The majority of Zell's allegations concern conduct of Israeli banks and his belief that these actions have been unfair to him or his clients.   But conduct of third parties (even if related to the banks' compliance with FATCA) does not confer standing to bring suit against Defendants. See, e.g., *Ammex Inc. v. United States*, 367 F.3d 530, 533 (6th Cir. 2004).   Nor may Zell seek redress on behalf of third parties who have allegedly suffered harm, including unidentified clients. See *Warth v. Seldin*, 422 U.S. 490, 499 (1975).   The third parties who have allegedly suffered harm are not plaintiffs, thus, alleged harm to them does not provide a basis for Zell to maintain this suit.

The contention that disclosure of the identity of clients for whom Zell holds funds in trust violates the attorney-client privilege is also without merit.   He gives no example of harm that has occurred or how he was harmed by disclosure of clients' identities.   He cannot raise the attorney-client privilege on his clients' behalf, nor is the fact of representation privileged. See *In re Special Sept. 1978 Grand Jury (II)*, 640 F.2d 49, 62 (7th Cir. 1980) ("[A]ttorney-client privilege belongs to the client alone[.]"); *United States v. Robinson*, 121 F.3d 971, 976 (5th Cir. 1997) ("The fact of representation . . . is generally not within the privilege.").   It is the fiduciary relationship, not the attorney-client relationship, that is the basis for the reporting requirement.

The claims that Zell asserts on his own behalf fare no better.   His compliance with a client's wish to avoid the FATCA reporting requirements potentially subjects the client—not Zell—to the risk of imposition of a 30% tax. See 26 U.S.C. § 1471(b)(1)(D).   Zell himself has not been assessed a 30% withholding tax under FATCA, nor could he (or his clients) be, because 30% withholding under § 1471 is not presently being imposed against Israeli FFIs or their recalcitrant

21

account holders.   Zell has not had a penalty imposed against him for any willful failure to file an

FBAR either.   He has therefore suffered no concrete and particularized injury sufficient to convey

standing. See *Lujan*, 504 U.S. at 560.   Taking the allegations of the complaint at face value, Zell is

losing clients because of discriminatory actions of the Israeli banks.   Indeed, in their Reply,

Plaintiffs admit it is Zell's client, a non-party, who objects to reporting. Reply at 4.

In their reply, Plaintiffs are more focused, directing all of their ire at the invasion of their

privacy:

> A central burden is extensive financial disclosure that Plaintiffs do
> not want. …   This opposition to disclosure provides standing to
> challenge provisions (including IGAs) expressly *requiring*
> disclosure….   So [P]laintiffs have standing to challenge FATCA,
> IGAs, and FBAR disclosure requirements, and they have standing
> to challenge the FFI Penalty (30% tax on payments to
> non-compliant FFIs)…because those FFIs disclose account holders'
> information *because of* that penalty.

Reply at 3.   They continue, "Plaintiffs object to disclosure and also object to this penalty

specifically designed to compel them to this disclosure, providing them standing." Reply at 4.

> But Plaintiffs verified that they do not want their financial
> affairs disclosed to the U.S. Government under FATCA, including
> [26 U.S.C. 6038D(a)], the necessary implication of which is either
> that Plaintiffs are doing such disclosure and want to cease or that
> Plaintiffs have arranged their affairs so as to avoid such disclosure
> that would otherwise have occurred, either of which gives them
> standing. (See, e.g., Doc. No. 1, PageID 12 (¶ 23), 14-15 (¶¶ 35, 37)
> (altered financial affairs to avoid disclosure), 15 (¶ 38).)
> Moreover, individuals may report otherwise qualifying accounts
> under that amount, are encouraged to do so, and the Government has
> not said that it would refuse such reports.
>
> The Government claims Plaintiffs may not challenge the
> FBAR requirement's Willfulness Penalty, 31 U.S.C. 5321(b)(C)(i),
> because none alleged "a bank account exceeding $10,000 in value."
> (Doc. No. 16, PageID 213.)   But Plaintiffs alleged that they

> reasonably feared they would be subject to the Willfulness Penalty
> for willful failure to file FBARs.

Reply at 5.

Plaintiffs also contend that the existence of applicable statutory requirements and penalties might suffice for standing to challenge the unconstitutional provisions. Reply at 6 (citing *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341-46 (2014); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) and *Doe v. Bolton*, 410 U.S. 179, 188 (1973)). However, this only applies where petitioners have alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 134 S. Ct. at 2332. Plaintiffs here have not identified a constitutionally protected interest.

The Supreme Court has held that depositors have no "reasonable expectation of privacy" in "information kept in bank records" because documents like "financial statements and deposit slips[] contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *United States v. Miller*, 425 U.S. 435, 442 (1976); see also *id.* at 440 (noting that the depositor "can assert neither ownership nor possession" over the records at issue); *Smith*, 442 U.S. at 743-44 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.").3

The only Plaintiff to have standing then is Kuettel, who is limited to claims concerning the FBAR requirement present in Count Three and Count Six.

---

3 Here, the Supreme Court's estimation of what a reasonable person might expect appears to be diverging from reality. "A 2003 study conducted by Christopher Slobogin and Joseph E. Schumacher found that the 217 subjects considered 'perusing bank records" as more intrusive than a patdown or even an arrest for 48 hours." Samantha Arrington, *Expansion of the Katz Reasonable Expectation of Privacy Test Is Necessary to Perpetuate A Majoritarian View of the Reasonable Expectation of Privacy in Electronic Communications to Third Parties*, 90 U. Det. Mercy L. Rev. 179, 180 (2013). See also, e.g., Henry F. Fradella et. al., *Quantifying Katz: Empirically Measuring "Reasonable Expectations of Privacy" in the Fourth Amendment Context*, 38 Am. J. Crim. L. 289, 371 (2011) ("judges often fail to appreciate the degree to which 'society' believes privacy should be protected from law enforcement intrusions.").

Count Three challenges what it characterizes as heightened reporting requirements for foreign financial accounts denying U.S. citizens living abroad the equal protection of the laws. Plaintiffs quote both the Administrative Procedure Act and the Constitution. Under section 706 of the Administrative Procedure Act ("APA"), a court must "hold unlawful and set aside agency action . . . found to be – . . . (B) contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706. In the Constitution, the Fifth Amendment provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law. . . ." U.S. Const. amend. V. The Due Process Clause of the Fifth Amendment includes a guarantee of equal protection equivalent to that expressly provided for under the Equal Protection Clause of the Fourteenth Amendment. "An equal protection claim against the federal government is analyzed under the Due Process Clause of the Fifth Amendment." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995); United *States v. Ovalle*, 136 F.3d 1092, 1095 (6th Cir. 1998). Thus, the federal government may not "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1.

"We begin, of course, with the presumption that the challenged statute"—FATCA—"is valid. Its wisdom is not the concern of the courts; if a challenged action does not violate the Constitution, it must be sustained[.]" *INS v. Chadha*, 426 U.S. 919, 944 (1983); see also *National Federation of Independent Business v. Sebelius* 132 S. Ct. 2566, 2594 (2012) ("'[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895))).

Plaintiffs contend the only financial information the IRS requires to be reported about domestic accounts is the amount of interest paid to the accounts during a calendar year, 26 U.S.C. §§ 6049(a), (b); 26 C.F.R. §§ 1.6049-4(a)(1), 1.6049-4T(b)(1). For a foreign account, the

24

information reported to the IRS includes not only the interest paid to the account, 26 USC § 1471(c)(1)(C); 26 C.F.R. §§ 1.1471-4(d)(3)(ii), -4(d)(4)(iv); Canadian IGA, art. 2, § 2(a)(4); Czech IGA, art. 2, § 2(a)(4); Israeli IGA, art. 2, § 2(a)(4); Swiss IGA, arts. 3, 5, but also the amount of any income, gain, loss, deduction, or credit recognized on the account, 26 C.F.R. § 1.6038D-4(a)(8), whether the account was opened or closed during the year, id. § 1.6038D-4(a)(6), and the balance of the account, 26 USC §§ 1471(c)(1)(C), 6038D(c)(4); 26 CFR §§ 1.1471-4(d)(3)(ii), 1.6038D-4(a)(5); Canadian IGA, art. 2, § 2(a)(6); Czech IGA, art. 2, § 2(a)(6); Israeli IGA, art. 2, § 2(a)(6); Swiss IGA, arts. 3, 5; FinCEN, BSA Electronic Filing Requirements For Report of Foreign Bank and Financial Verified Complaint for Declaratory and Injunctive Relief 41 Case: 3:15-cv-00250-TMR Doc #: 1 Filed: 07/14/15 Page: 41 of 59 PAGEID #: 41 Accounts (FinCEN Form 114) 15 (June 2014), http://www.fincen.gov/forms/files/ FBAR%20Line%20Item%20Filing%20Instructions.pdf. Plaintiffs assert that comparable information is not required to be disclosed regarding domestic accounts of U.S. citizens.

Plaintiffs decry that U.S. citizens living in foreign countries are in this manner treated differently than U.S. citizens living in the United States. According to Plaintiffs, the federal government has no legitimate interest in knowing the amount of any income, gain, loss, deduction, or credit recognized on a foreign account, whether a foreign account was opened or closed during the year, or the balance of a foreign account.

Plaintiffs contend that the "heightened reporting requirements" imposed by FATCA, the FBAR information-reporting requirements, and the Canadian, Swiss, Czech, and Israeli IGAs, violate the Fifth Amendment rights of "U.S. citizens living in a foreign country" and should be enjoined. See Complaint ¶¶ 124-130.

Plaintiffs are unlikely to succeed on the merits of their claim that "U.S. citizens living in a foreign country are treated differently than U.S. citizens living in the United States," Complaint ¶ 128, without rational basis. A litigant may challenge federal government action under the Fifth Amendment's due process clause on the same grounds as a challenge to state action under the Fourteenth Amendment's equal protection clause. See *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975); see also *Buckley v. Valeo*, 424 U.S. 1, 93 (1976). "Under the Due Process Clause, if a statute has a reasonable relation to a proper legislative purpose, and [is] neither arbitrary nor discriminatory, the requirements of due process are satisfied." *Nebbia v. New York*, 291 U.S. 502, 537 (1934) (internal quotation marks and citations omitted). Likewise, under the Equal Protection Clause, a statute not directed at a suspect or quasi-suspect class must be upheld if it has a rational basis. *Clements v. Fashing*, 457 U.S. 957, 967 (1982) (citing *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)). "U.S. citizens living in a foreign country" are not a suspect or semi-suspect class of people, so Defendants need only show that "the classification drawn by [a] statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); see also *Igartua de la Rosa v. United States*, 842 F. Supp. 607, 611 (D.P.R. 1994).

A court "will not overturn [government conduct] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [it] can only conclude that the [government's] actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979); see also *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313-14 (1993) (a statute subject to rational basis review must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). A facial challenge, because of

the extraordinary relief, requires a "heavy burden" and is "the most difficult challenge to mount successfully[.]" *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Plaintiffs' equal protection claims fail because the statutes, regulations, and executive agreements that they challenge simply do not make the classification they assert. None of the challenged provisions single out U.S. citizens living abroad. Instead, all Americans with specified foreign bank accounts or assets are subject to reporting requirements, no matter where they happen to live. The provisions Plaintiffs contend discriminate against "U.S. citizens living abroad" actually apply to all U.S. taxpayers, no matter their residence. Plaintiffs argue that "[i]n practice, the increased reporting requirements for foreign financial accounts discriminate against U.S. citizens living abroad," see Doc. No. 8-1 at 22 (PageID 160), suggesting a claim of discrimination based on disparate impact. But it is well-settled that "mere disparate impact is insufficient to demonstrate an equal protection violation." *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995); see also *Washington v. Davis*, 426 U.S. 229, 244-45 (1976).

FATCA requires FFIs to provide specified information about "United States Accounts." See 26 U.S.C. § 1471(c)(1)(C). "United States Accounts" are defined in the statute as "any financial account which is held by one or more specified United States persons or United States owned foreign entities." 26 U.S.C. § 1471(d)(1)(A). Similarly, the individual reporting requirements of FATCA under § 6038D(c)(4) apply to "any individual who, during any taxable year, holds any interest in a specified foreign financial asset[.]" 26 U.S.C. § 6038D(a) (emphasis added). The Bank Secrecy Act, under which the FBAR reporting requirement arises, also applies to any taxpayer with a financial interest in, or signatory authority over, a foreign financial account exceeding certain monetary thresholds. See 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.350 &

27

1010.306(c).   Neither do the challenged regulations make the classification Plaintiffs challenge;
they apply to all taxpayers holding certain foreign accounts or assets. See 26 C.F.R. §
1.1471-4(d)(3)(ii) (FFI reporting requirement regarding "accounts held by specified U.S.
persons"); 26 C.F.R. § 1.6038D-4(a)(5), (6), & (8) (setting forth information to be reported in
Statement of Specified Foreign Financial Assets).   Neither do the IGAs distinguish between the
residence of the account holders whose information must be reported.

Plaintiffs have not correctly identified the classification made by these laws. The most
basic element of an equal protection claim is the existence of at least two classifications of persons
treated differently under the law. See *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d
1031, 1036 (6th Cir. 1992).   But Plaintiffs fail to recognize that similarly situated persons to
themselves—U.S. taxpayers living in the United States who hold foreign accounts—are not
treated differently.   In fact, for U.S. citizens living abroad, the regulations under 26 C.F.R. §
1.6038D-2 do not kick in until higher reporting thresholds are reached, as the regulations
recognize that such individuals are likely to have significant foreign accounts in the ordinary
course of their lives.   For married individuals filing jointly, the filing threshold goes from $50,000
for U.S. residents to $150,000 for non-U.S. residents.   To the extent that the law treats U.S.
citizens living abroad unequally, it is in their favor insofar as the reporting requirements for
foreign accounts are actually less onerous.

The distinction that the regulations do make is rationally related to a legitimate government
interest.   The U.S. tax system is based in large part on voluntary compliance: taxpayers are
expected to disclose their sources of income annually on their federal tax returns. The information
reporting required by FATCA is intended to address the use of offshore accounts to facilitate tax

28

evasion, and to strengthen the integrity of the voluntary compliance system by placing U.S. taxpayers that have access to offshore investment opportunities in an equal position with U.S. taxpayers that invest within the United States. Third party information reporting is an important tool used by the IRS to close the tax gap between taxes due and taxes paid. The knowledge that financial institutions will also be disclosing information about an account encourages individuals to properly disclose their income on their tax returns. See Leandra Lederman, *Statutory Speed Bumps: The Roles Third Parties Play in Tax Compliance*, 60 STAN. L. REV. 695, 711 (2007). Unlike most countries, U.S. taxpayers are subject to tax on their worldwide income, and their investments have become increasingly global in scope. Absent the FATCA reporting by FFIs, some U.S. taxpayers may attempt to evade U.S. tax by hiding money in offshore accounts where, prior to FATCA, they were not subject to automatic reporting to the IRS by FFIs. The information required to be reported, including payments made or credited to the account and the balance or value of the account is to assist the IRS in determining previously unreported income and the value of such information is based on experience from the DOJ prosecution of offshore tax evasion. See *Senate Permanent Subcommittee on Investigations bipartisan report on "Offshore Tax Evasion: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts,"* February 26, 2014; see also *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 29 (1974) ("when law enforcement personnel are confronted with the secret foreign bank account or the secret foreign financial institution they are placed in an impossible situation…they must subject themselves to time consuming and often times fruitless foreign legal process.").

The FBAR reporting requirements, likewise, have a rational basis. As the Supreme Court noted in *California Bankers*, when Congress enacted the Bank Secrecy Act (which provides the

statutory basis for the FBAR), it "recognized that the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade the regulatory mechanism of the United States, had markedly increased." *Id*. at 38. The Government has a legitimate interest in collecting information about foreign accounts, including account balances held by U.S. citizens, for the same reason that it requires reporting of information on U.S.-based accounts. The information assists law enforcement and the IRS, among other things, in identifying unreported taxable income of U.S. taxpayers that is held in foreign accounts. Without FBAR reporting, the Government's efforts to track financial crime and tax evasion would be hampered. Congress, through FBAR reporting, attempted to complement domestic reporting on financial transactions. U.S. taxpayers who place their funds in foreign accounts cannot put themselves on a better footing than U.S. taxpayers who conduct their transactions stateside. FBAR reporting prevents individuals from trying to evade domestic regulation and provides a deterrent for those who would use foreign accounts to engage in criminal activity.

The distinctions made by FATCA, the FBAR reporting requirements, and the IGAs simply do not evince, on their face, discrimination that is "so unjustifiable as to be violative of due process." *Schneider v. Rusk*, 377 U.S. 163, 168 (1964).

In Count Six, Plaintiffs contend that the FBAR "Willfullness Penalty" is unconstitutional under the Excessive Fines Clause. Plaintiffs decry that 26 U.S.C. § 5321 imposes a penalty of up to $100,000 or 50% of the balance of the account at the time of the violation, whichever is greater, for failures to file an FBAR as required by 26 U.S.C. § 5314 (the FBAR "Willfulness Penalty"). 31 U.S.C. § 5321(b)(5)(C)(i).

Plaintiffs allege the Willfulness Penalty is designed to punish and is therefore subject to the Excessive Fines Clause. Plaintiffs further allege the Willfulness Penalty is grossly disproportionate to the gravity of the offense.

Plaintiffs' Eighth Amendment claims, however, are not ripe for adjudication because no withholding or FBAR penalty has been imposed against any Plaintiff; indeed, the 30% FFI withholding tax under § 1471(a) will never be imposed against any of them because they are individuals, not FFIs. Additionally, Plaintiffs' claims fail because they cannot show that the FATCA taxes and the willful FBAR penalties are grossly disproportional to the gravity of their (as yet unspecified) conduct. See *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

"Ripeness is a justiciability doctrine designed to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements. Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Kentucky Press Ass'n v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (citation and internal quotation marks omitted). The Sixth Circuit has listed three factors to be considered when deciding whether claims are ripe for adjudication: (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claim; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings. *Id.*

Plaintiffs' Eighth Amendment challenges are not ripe under the *Kentucky Press Association* factors. First, it is not clear that any harm Plaintiffs contemplate will ever come to pass. With respect to the FATCA withholding tax in § 1471(b)(1), Plaintiffs can request a credit or refund of a future withheld amount on their federal income tax returns. See 26 U.S.C § 1474(a);

26 C.F.R. § 1.1474-3.   Several Plaintiffs are United States citizens, so they must file federal income tax returns anyway. 26 C.F.R. § 1.6012-1(a)(1).   Nelson and Kuettel, who renounced their U.S. citizenship, may possibly also be required to file returns if they have U.S.- source income. 26 C.F.R. § 1.6012-1(b)(1)(i).   As for the willful FBAR penalty, whether it is imposed is entirely in IRS's discretion. See 31 U.S.C. § 5321(a)(5); 31 C.F.R. § 1010.810(g).

Second, the factual record is not sufficiently developed to weigh whether the FATCA withholding taxes or FBAR penalty is grossly disproportionate, and such a factual record cannot reasonably be developed here.   An Eighth Amendment proportionality analysis is "guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the [penalty] imposed on other [offenders] in the same jurisdiction; and (iii) the [penalty] imposed for commission of the same [offense] in other jurisdictions." *Solem v. Helm*, 463 U.S. 277, 292 (1983) (Cruel and Unusual Punishments Clause analysis); see also *Bajakajian*, 524 U.S. at 336 (drawing Excessive Fines Clause standard from Cruel and Unusual Punishments Clause jurisprudence). The first factor requires review of the circumstances of the offense "in great detail." *Solem*, 463 U.S. at 290-91.   In this case, there are no circumstances to review, because no FATCA tax or FBAR penalty has been imposed.   A fact-specific determination of excessiveness is impossible where any wrongful conduct is hypothetical.

Finally, Plaintiffs will not suffer appreciable hardship from the Court declining to hear their Eighth Amendment challenges.   The Sixth Circuit has noted that, "[r]ipeness will not exist … when a plaintiff has suffered (or will immediately suffer) a small but legally cognizable injury, yet the benefits to adjudicating the dispute at some later time outweigh the hardship the plaintiff will have to endure by waiting." *Airline Profs. Ass'n of Int'l Broth. of Teamsters, Local No. 1224*

*v. Airborne, Inc.*, 332 F.3d 983, 988 n.4 (6th Cir. 2003). Challenges to statutes are not ripe where delaying judicial review results in no real harm. See *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810-11 (2003). Once an amount is actually withheld from a payment, Plaintiffs can (after properly exhausting administrative remedies) file a refund suit if the IRS improperly fails to refund the withholding. See 26 U.S.C. § 7422. If an FBAR penalty is assessed against a Plaintiff, that Plaintiff may challenge the penalty at a later time. See *Moore v. United States*, No. C13-2063-RAJ, 2015 WL 1510007 at *12-*13 (W.D. Wash. Apr. 1, 2015) (rejecting Eighth Amendment challenge to non-wilful FBAR penalty). At present, Plaintiffs have not established that their Eighth Amendment claims require immediate injunctive relief.

Because they have not alleged that any FATCA withholding taxes or willful FBAR penalties have actually been imposed against them, Plaintiffs appear to raise a facial challenge to those exactions under the Excessive Fines Clause. To prevail on a facial challenge, Plaintiffs must show that the statutes are "unconstitutional in all of [their] applications," *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) (internal quotation omitted). The FATCA taxes satisfy neither of the two *Bajakajian* factors: they are not fines, nor are they grossly disproportional. 524 U.S. at 334. The willful FBAR penalty, while arguably equivalent to a fine, is not grossly disproportional in all applications.

The FATCA withholding taxes in § 1471(a) and § 1471(d)(1)(B) are taxes, not penalties. The Eighth Amendment applies to payments that "constitute punishment for an offense." *Bajakajian*, 524 U.S. at 328. Neither taxes nor remedial fines are punishment for an offense, and thus are not subject to the Eighth Amendment. See *Austin v. United States*, 509 U.S. 602, 621-22 (1993) (a fine is not "punishment for an offense" if it serves a wholly remedial purpose).

33

The FATCA withholding tax rate of 30% is remedial because it is the same rate imposed on all fixed or determinable annual or periodic income paid from a U.S. source to a non-resident alien. 26 U.S.C. § 1441(a), (b). FATCA's withholding tax on FFIs effectively assumes that if an FFI refuses to disclose information to the IRS, all U.S.-sourced payments to its account holders may be subject to that rate of taxation. Similarly, FATCA's withholding tax on recalcitrant account holders under § 1471(b)(1)(D) merely extends the same withholding rate as § 1441 to accounts where the account holder refuses to be identified. The rate is effectively reduced if the FFI's country has a substantive tax treaty reducing the rate of tax on a particular payment, see 26 U.S.C. § 1474(b)(2)(A)(i), underlining that the FATCA withholdings are meant to collect tax, not to impose a punishment. Again, to the extent that one of the individual Plaintiffs has money withheld over and above what is necessary to pay his or her federal income tax, the withholding is refundable. 26 U.S.C. § 1474; 26 C.F.R. §§ 1.1474-3, 1.1474-5. At least as to these Plaintiffs, the FATCA withholding taxes serve the remedial purpose of protecting the fisc. See *Helvering v. Mitchell*, 303 U.S. 391, 400-01 (1938) (50% fraud penalty was remedial in nature because it was "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation").

Nor is the magnitude of the withholding tax grossly disproportional, since it roughly approximates the presumed tax loss from FATCA non-compliance. Congress's determination that a 30% withholding tax rate was appropriate is accorded substantial deference. See, e.g., *United States v. Dobrowolski*, 406 F. App'x 11, 12-13 (6th Cir. 2010) (citing cases) (noting traditional deference given to legislative policy determinations). A penalty that is equal to, and does not duplicate, the applicable tax rate on a given payment is proportional to the "offense" of failing to

34

report information under FATCA—it certainly is not excessive in "all" applications. Therefore, Plaintiffs' facial Eighth Amendment challenge to the § 1471 taxes is rejected.

The willful FBAR penalty also survives a facial challenge because the maximum penalty will be constitutional in at least some circumstances. A maximum penalty fixed by Congress is due substantial deference from the courts. See *Bajakajian*, 524 U.S. at 336 ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."); see also *United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1309 (11th Cir. 1999). Congress increased the maximum FBAR penalty to its present level in 2004. See 31 U.S.C. § 5321(a)(5)(C). Congress chose this penalty range because FBAR reporting furthers an important law enforcement goal. The Senate Finance Committee explained:

> The Committee understands that the number of individuals involved in using offshore bank accounts to engage in abusive tax scams has grown significantly in recent years . . . . The Committee is concerned about this activity and believes that improving compliance with this reporting requirement is vitally important to sound tax administration, to combating terrorism, and to preventing the use of abusive tax schemes and scams.

S. Rep. 108-257, at 32 (2004) (explaining increase in maximum willful penalty and creation of new civil non-willful penalty). Indeed, FBARs are available not only to the IRS but also to a variety of law enforcement agencies investigating crimes like money laundering and terrorist financing. See, e.g., *Amendment to the Bank Secrecy Act Regulations–Reports of Foreign Financial Accounts*, 75 Fed. Reg. 8844, 8844 (Feb. 26, 2010). Setting the maximum willful penalty as a substantial proportion of the account ensures that the willful penalty is not merely a cost of doing business for tax evaders, terrorists, and organized criminals.

A 50% willful FBAR penalty—the maximum permitted by statute—is severe. But given the ills it combats, it is an appropriate penalty in at least some circumstances.   Accordingly, the Plaintiffs' facial challenge to it under the Eighth Amendment fails.

**IV.    Conclusion**

Plaintiffs have failed to establish that they are entitled to a preliminary injunction. First, Plaintiffs are not likely to succeed on the merits.   They lack standing, as the harms they   allege are remote and speculative harms, most of which would be caused by third parties, illusory, or self-inflicted.   Plaintiffs' allegations also fail as a matter of law, as there is no constitutionally recognized right to privacy of bank records.

Second, Plaintiffs are not likely to suffer irreparable injury if a preliminary injunction is not granted.   Their lack of standing means that they lack a sufficiently concrete and particularized injury to sue in the first instance, much less an injury that is so imminent and irreparably harmful as to justify preliminary injunctive relief.   The absence of the irreparable injury is reinforced by the facts that: their Fifth Amendment equal-protection allegation is based on a classification that does not exist; their Eighth Amendment claims are not ripe, with no FATCA withholding or willful FBAR penalties having been imposed against them; and their Fourth Amendment counts are based on information reporting that does not violate the Constitution.

The third factor, the balance of the equities, also weighs against the entry of a preliminary injunction.   That is because the fourth factor, the public interest, is best served by keeping the statutory provisions at issue, as well as their implementing regulations and international agreements, in place and enforceable during the pendency of this lawsuit.   The FATCA statute, the IGAs, and the FBAR requirements encourage compliance with tax laws, combat tax evasion,

and deter the use of foreign accounts to engage in criminal activity.  A preliminary injunction would harm these efforts and intrude upon the province of Congress and the President to determine how best to achieve these policy goals. Thus, Plaintiffs' Motion for Preliminary Injunction, ECF 8, is **DENIED**.

      **DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, September 29, 2015.


s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE